UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RODNEY C. ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-1076-DFH-TAB |
| | ) | |
| DIVERSIFIED SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rodney Anderson has sued defendant Diversified Systems, Inc. for violating the Civil Rights Act of 1991, Title VII of the Civil Rights Act of 1964 ("Title VII"), the Civil Rights Act of 1866, and the Family and Medical Leave Act of 1993 ("FMLA").  Anderson claims that Diversified discriminated against him because of his race, violating 42 U.S.C. § 1981 and § 2000e-2.  He also claims that Diversified retaliated against him for opposing the perceived racial discrimination and for taking FMLA leave.

Defendant has moved for summary judgment on all claims.  As explained in detail below, the court denies defendant's motion.  Giving Anderson the benefit of conflicts in the evidence and reasonable inferences from it, Anderson has presented evidence that would allow a reasonable jury to find that Diversified treated him differently because of his race and retaliated against him for opposing

such discrimination.   Anderson has also demonstrated a triable issue of fact regarding his FMLA retaliation claim, although that question is considerably closer.

### Summary Judgment Standard

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party can win summary judgment by establishing the lack of evidentiary support for the non-moving party's position.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The

essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

Plaintiff has argued that much of defendant's evidence must be disregarded because it is conclusory and self-serving, citing *Reeves*, 530 U.S. at 150-51; *Byrd v. Illinois Dep't of Public Health*, 423 F.3d 696, 712 (7th Cir. 2005); and *Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004).  The argument is an interesting effort to turn in favor of the plaintiff some misguided arguments used most often by defendants.  In *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (reversing summary judgment for officer in 42 U.S.C. § 1983 case), the Seventh Circuit acknowledged the many cases stating that self-serving, uncorroborated, and conclusory statements in affidavits and testimony are not sufficient to defeat a motion for summary judgment.  Recognizing that the moving party's affidavits are usually no less "self-serving" than the opposing party's evidence, the *Payne* court explained that the real problem with such affidavits was not their self-serving nature but a lack of personal knowledge, such as an employee's unsupported conclusion that the employer made a decision on a discriminatory basis.  Accord, *Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 785 (7th Cir. 2001) (noting that moving party's affidavits "are no more credible than the affidavits presented by" plaintiff).

In an employment discrimination case, a decision-maker can testify about his or her motives in making a challenged decision.  Such testimony is invariably self-serving, but if there is no rebuttal or impeachment, the self-serving testimony can support summary judgment for the employer.  On this point, hundreds of cases affirming summary judgment for lack of evidence of pretext can be cited. See, *e.g.*, *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-70 (7th Cir. 1995) (affirming summary judgment for employer; observing that discrediting an employer's self-serving affidavit "does not defeat summary judgment if at least one reason for each of the actions stands unquestioned").

To support his argument that the court should disregard most of defendant's critical evidence, plaintiff cites a passage from *Reeves v. Sanderson Plumbing Products* in which the Supreme Court explained that a court deciding a motion for summary judgment or for judgment as a matter of law "should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  530 U.S. at 151, quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2529 (2d ed. 1995).

The *Reeves* Court could not have intended this passage to mean that a court should disregard all self-serving testimony from witnesses associated with the moving party, as plaintiff argues it should.  That approach would effectively defeat

summary judgment as a tool for its intended purpose: to weed out cases in which the evidence is so lopsided that one side or the other must prevail as a matter of law, without a need for the expense and energy of trial. The passage in *Reeves* is a critical reminder that courts must take care not to weigh credibility or to choose from among reasonable inferences when deciding motions for summary judgment. When the moving party's evidence is impeached with contradictory evidence, of course, the court can and should disregard it. But the mere fact that evidence is self-serving does not remove it from consideration, whether it serves the moving party or the opposing party.

### Facts for Summary Judgment

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to the non-moving party, plaintiff Rodney Anderson. *Reeves*, 530 U.S. at 150. Anderson is a black man who began working for Diversified, a printed circuit board manufacturer, in April 2000. He started off as an hourly line employee working in Diversified's surface mount department. In July 2000, he was promoted to become a group leader in the company's Methode department, which produced custom circuit boards for a particular customer. As a group leader for the Methode department's second shift, Anderson ran the department after the first shift supervisor left each day. Howard Dep. 8-9.

In June 2002, the Methode department supervisor, Jeff Howard, became the supervisor of Diversified's engineering and maintenance departments. Diversified assigned Anderson to take over Howard's supervisory duties in the Methode department. Anderson Aff. ¶ 7. A month later, Anderson complained to the manufacturing manager, Kevin Raywood, about serving as the department's supervisor without receiving any promotion or additional compensation. When he began as the Methode supervisor, Howard – a white man – earned a salary of $40,000. Howard Dep. 6-8. Anderson earned $12.89 per hour. Raywood promised Anderson a one dollar raise. Anderson Aff. ¶ 9. In mid-July 2002, Diversified gave Anderson the title of interim Methode department supervisor and a raise of fifty cents per hour.

After this quasi-promotion, Anderson again complained about his compensation and the length of time Diversified was taking to select a permanent supervisor. He told Raywood he felt that he was being treated differently because he was black. Anderson Dep. 34-36. Diversified had a significant number of black employees, but Anderson was the only black supervisor. Fox Dep. 176-77. In fact, Anderson was the only black supervisor that Diversified had ever employed. *Id.* at 176. Diversified eventually appointed Anderson as the permanent Methode department supervisor in September 2002 with a salary of $36,000.

In 2004, Anderson complained to the new manufacturing manager, Steve Whistler, about the amount of work Diversified required him to do compared to the amount of work it had required of the former Methode department supervisor. Anderson felt that his "workload was almost triple the workload that Jeff Howard had." Anderson Dep. 37.[1]  Anderson did not have a group leader to assist him in running the department.   He was required to maintain equipment that maintenance workers or engineers had repaired when Howard supervised the department.  He was not allowed to attend production and supervisor meetings that Howard had attended.  Howard testified that he never attended production meetings, see Howard Dep. 12, but under the summary judgment standard, the court accepts Anderson's testimony on that point.

Anderson told Whistler and Bernice Fox, the human resources director, that he felt he was not being fairly compensated for his work because he was the only black supervisor.  As a result of these complaints, Diversified gave Anderson a raise of $5,000 as an "adjustment to better align w/job responsibilities/peer compensation."  Anderson Dep. Ex. 6 at 7.  About two months later, Anderson complained to Whistler and Fox that even with the raise, he was still not being

---

[1]Diversified compiled a summary of the hours other supervisors worked from June 2005 to January 31, 2006.  Fox Dep. Ex. 11 at 2.  The summary indicates that during that time period, Anderson worked less than most other supervisors on the list.  The list does not include Howard's hours, nor does it indicate how many hours Anderson or any other supervisor worked before June 2005.  To the extent that the summary contradicts Anderson's testimony about the number of hours he worked from June 2005 to January 31, 2006, the court accepts Anderson's testimony on that point for purposes of summary judgment.

fairly compensated because he was the only black supervisor.  Anderson felt that the raise was needed to rectify the pay disparity between his salary and Howard's salary as the Methode department supervisor.   Anderson Dep. 119-21, 232.  According to Anderson, the raise did not account for the increased responsibilities he assumed after becoming the supervisor.  *Id.*  In July 2004, Diversified gave Anderson another $5,000 raise as a "wage adjustment to better align salary with respect to other supervisors and with [hourly] wages in area of responsibility."  Anderson Dep. Ex. 6 at 8.

Based on a positive job performance evaluation, Diversified gave Anderson an additional two percent raise in May 2005.  Anderson felt that the increase was inadequate, but Whistler told Anderson "that was the best he could do at the time." Anderson Dep. 122.  Whistler resigned later in 2005, and David DiGregorio became the new manufacturing manager.   In September 2005, soon after DiGregorio began, Anderson told DiGregorio that he had been discriminated against in the past and that he hoped that "this wouldn't continue with him being the new supervisor."  *Id.* at 57.  He told DiGregorio that the Methode department was one of the busiest departments and was the only one where nearly half of the employees were temporary.  *Id.* at 58-59.  Having so many temporary employees interfered with Anderson's ability to train his staff properly.

Anderson also talked with the new general manager of the division over the Methode department, David Fissell, in September 2005.  Fissell had analyzed the

financial status of the Methode lines and found that the department was losing 40 cents for every dollar of product shipped.  Fissell Dep. 48-49.  Fissell talked to Anderson about his findings.  Anderson told Fissell that he was "not allowed to operate the line the way he wanted to operate it" and informed Fissell about having so many temporary employees.  *Id.* at 49.  Consequently, Fissell hired many of these temporary employees as permanent employees in late November or early December 2005.  While the "financial picture on the line didn't change in the sense that it was profitable, Rodney made it very, very close to profitability with some of the things that he had done by dropping the number of people down."  *Id.* In October 2005, Fissell fired the supervisor of the shipping department.  He talked to Anderson about taking over the supervisory duties in the shipping department, about attending training to develop his ability to supervise different departments, and about "a good possibility that methode would be shut down." Fissell Dep. 58.

A month later, Fissell asked Anderson why he was not attending the company's daily production meetings that all other supervisors attended. Anderson replied that since he had begun supervising the Methode department, his managers had repeatedly told him there was no need for him to attend the production meetings or other meetings for supervisors.  Anderson Dep. 13-29. Anderson had "heard secondhand that Mr. DiGregorio probably didn't let me attend the meetings because of my race."  *Id.* at 23.  After talking with Fissell, Anderson asked DiGregorio if he had not been allowed to go to the meetings

because he was black.  DiGregorio "kinda laughed it off and said, 'Ah, I'm sure it's not that.'"  *Id.* at 64.  Fissell told Anderson that he should come to the production meetings.  During this meeting with Fissell, Anderson again complained about the inadequacy of his salary.  He had taken on additional duties from the shipping department but received no additional compensation.  Fissell approved a $2,000 raise for Anderson for "additional responsibilities."  Anderson Dep. Ex. 6 at 10.  Fissell also told Anderson that he intended to fire the supervisor of the assembly department, Eric Steele, and wanted to move Anderson into that position.  Anderson Dep. 160-61.  In light of the company's eventual decision to fire Anderson and have Steele take over his work, this conversation is particularly important for evaluating the company's explanations for firing Anderson.

In November 2005, Bernice Fox, the human resources director, and Maxine Jolliff, an employee in the scheduling office, informed Anderson that he was not and had not been on the company's supervisor email list.  *Id.* at 10-11.  They then added Anderson to the list.  According to Anderson, Diversified also prevented him from attending a business skill development training.  He heard other supervisors discussing the class, but he did not know what they were talking about.  *Id.* at 177-78.  Anderson asked DiGregorio about attending the class.  DiGregorio sent him to an employee in the engineering department who was in charge of signing up attendees.  The engineering employee told Anderson that there was only one more class, that Anderson was not in it, and that he should talk to DiGregorio.

*Id.* at 177, 182-83.  Anderson responded, "'You know what?  You all [are] giving me the runaround again, just forget it.'"  *Id.* at 183.

On January 17, 2006, there was a problem with a shipment from the Methode department.   Apparently, DiGregorio knew that the shipment was supposed to be sent via a particular shipment service, but he did not tell anyone else that the shipment had special instructions.  *Id.* at 138-39.  When another employee sent the shipment according to the regular instructions, DiGregorio cursed Anderson out about it.  *Id.* at 136-37.  After this interaction, Anderson went to Bernice Fox's office.  Fox called in Fissell.  Anderson told them about the incident, asked if DiGregorio was treating him differently because he was black, and said that he felt like he was having a "nervous breakdown."  *Id.* at 140-41. Fissell told Anderson that "he was quite disturbed about this" and that he would take care of it.  *Id.* at 142.  Fissell then excused Anderson from work for a few days, told him to take "as much time" as he needed, and told Anderson to call Fox to let her know when he would be returning to work.  *Id.*  At some point, Anderson also told Fox that he was going to seek legal advice because he had "complained for years" and "no one had done anything."  *Id.* at 151.

Diversified excused and paid Anderson for the next two and a half days but used a vacation day to pay him for January 20.  He saw his doctor on Monday, January 23 and returned to work on Tuesday, January 24.  *Id.* at 202. Anderson's doctor had excused him from work from January 16 through January

24 for hypertension problems.  Anderson Aff. ¶ 28.  In the meantime, Diversified had fired DiGregorio, partly because of his interaction with Anderson over the shipment problem.  After returning on January 24, Anderson took several more days off because he "was still stressed out."  Anderson Dep. 202.  He informed Fox that he would not be returning until after he saw his doctor again on January 30. *Id.* at 203-04.  Fox asked him to stop by Diversified to pick up FMLA forms for his doctor to complete on his way to the appointment.  He did, and his doctor put him on leave for six weeks due to an "anxiety disorder related to job stress."  Anderson Dep. Ex. 13 at 1.

Fox called Anderson at home the morning of January 31 to ask why he was not at work.  He told her that his doctor had given him sleeping medication, that he had overslept, and that he would bring in the FMLA paperwork from his doctor that day.  Anderson gave Fox the FMLA forms that afternoon.  He then filed a worker's compensation claim based on the stress he felt.  The next day, February 1, he filed a charge of race discrimination against Diversified with the Indiana Civil Rights Commission.  Anderson Dep. Ex. 9.  On the afternoon of February 2, Fox called Anderson at home to tell him that Diversified had terminated him because it was eliminating his position.  Anderson Dep. 153; Anderson Aff. ¶ 47.

On November 8, 2006, Anderson filed a retaliation charge against Diversified with the Equal Employment Opportunity Commission ("EEOC").  Fox.

Aff. Ex. 1.   After the EEOC issued Anderson a right to sue letter, he sued Diversified in this court on July 14, 2006, alleging race discrimination under 42 U.S.C. § 1981 and § 2000e-2.   He also alleged that Diversified retaliated against him for opposing the perceived racial discrimination and for taking FMLA leave.   Defendant moved for summary judgment on all counts.[2]   This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.   Additional facts are noted below as needed, keeping in mind the standard applicable for summary judgment.

*Discussion*

I.   *Race Discrimination Claim*

Anderson claims that Diversified discriminated against him by treating him differently than white supervisors, violating 42 U.S.C. § 1981 and § 2000e-2. While there are significant differences between the two statutes in terms of procedural requirements and available remedies, courts use the same framework to analyze an employer's liability under both statutes.   See *Yarbrough v. Tower*

---

[2]Defendant has also moved to strike plaintiff's surreply.   See Docket Nos. 58 and 59.   Defendant points out that Southern District of Indiana Rule 56.1(d) permits the non-moving party to file a surreply only when the moving party relies on new evidence in its reply or objects to evidence the non-moving party presented in its response.   Under Rule 56.1(i), however, the court may excuse strict compliance with summary judgment procedure "in the interests of justice or for good cause."   Because defendant did not set forth or discuss the various routes for proving discrimination and retaliation claims until its reply brief, and because it introduced a new argument discussing a potential Indiana state law retaliation claim in its reply, the court denies the motion to strike the surreply, which addressed both of these issues.   Plaintiff's complaint did not, however, state a claim under Indiana state law for retaliation based on Anderson filing a worker's compensation claim.

*Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir. 1986) (affirming denial of employer's motion for judgment notwithstanding the verdict).  Anderson may use either the direct or indirect method to prove his discrimination claims.  Both paths require proof that the employer took at least one material, adverse action against the employee.  See *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007) (affirming summary judgment for employer).  Anderson bases his claims on six actions:  (1) being paid less than other supervisors; (2) being prohibited from attending meetings that other supervisors attended; (3) being excluded from Diversified's supervisor email list; (4) being excluded from a training; (5) having to work more than Jeff Howard, the former Methode department supervisor, for less pay; and (6) being terminated.

One action of which Anderson complains is not timely under Title VII:  being paid less than other supervisors.  Because Anderson filed his discrimination EEOC charge on February 1, 2006, his EEOC charge encompasses only those actions that occurred after April 6, 2005.  Anderson alleges that when Jeff Howard began supervising the Methode department, Diversified paid Howard a salary of $40,000.  When Anderson took over the department's supervisory duties in June 2002, he was earning $12.89 an hour.  Anderson Dep. Ex. 6 at 5.  After he complained about not being compensated for taking on additional responsibilities, Diversified retroactively increased his pay to $13.39 an hour (roughly $27,850 per year).  *Id.* at 5-6.  When Diversified officially promoted Anderson to the Methode department supervisor position in September 2002, Diversified paid him a salary

of $36,000.  As the Supreme Court found in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. —, 127 S. Ct. 2162, 2174 (2007), when the issue is not the employer's payment structure, the unlawful practice in pay disparity cases is the decision to pay members of a protected class differently.  Here, that decision occurred in June 2002 – years before Anderson filed his EEOC charge.  The claim for relief is timely, however, under section 1981's four-year statute of limitations.  See *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004) (finding that the federal "catchall" four-year statute of limitations applies to employment discrimination claims under section 1981 arising after the formation of the employment contract).

All of the alleged actions were sufficiently adverse to support a claim, at least on summary judgment.  See *Lewis v. City of Chicago*, 496 F.3d 645, 653-54 (7th Cir. 2007) (reversing summary judgment for employer on discrimination claim; finding that a reasonable jury could conclude that denial of training that would allow employee to move forward in her career was materially adverse); *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006) (affirming summary judgment for employer; recognizing that increasing workload without additional pay functioned as a pay reduction and was materially adverse); *Markel v. Board of Regents of University of Wisconsin System*, 276 F.3d 906, 911 (7th Cir. 2002) (affirming summary judgment for employer; recognizing that economic injuries and dismissals are material, adverse actions); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 932-33 (7th Cir. 1996) (reversing summary judgment for employer

in part; finding that the employer's practice of excluding the only black supervisor from regular meetings with all other supervisors presented "a genuine issue of material fact with respect to Mr. Johnson's exclusion from the meetings").

Under the direct method, Anderson must present evidence that Diversified was motivated to take these actions because he is black.  See *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (affirming summary judgment for employer).  That evidence can be direct or circumstantial (*i.e.*, the "convincing mosaic" route).  See *Phelan v. Cook County*, 463 F.3d 773, 779-80 (7th Cir. 2006) (reversing summary judgment for employer in part); *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736-37 (7th Cir. 1994).  Anderson has not presented any direct evidence of racial discrimination, but he has presented circumstantial evidence that could lead a jury to infer that Diversified acted adversely against him because he is black.  The Seventh Circuit has recognized three categories of persuasive, circumstantial evidence:  (1) dubious coincidences, such as suspicious timing, ambiguous statements, and comments or behavior directed at employees in the protected group; (2) evidence that the employer systematically treated employees outside the protected class better; and (3) evidence that the employee was qualified and that the employer's reason for treating him differently was pretext.  See *Troupe*, 20 F.3d at 736.

Anderson relies primarily on evidence in the second category.  He has shown that he was the only black supervisor at Diversified.  According to

Anderson, he was the only supervisor excluded from production and Methode department meetings.   Anderson Dep. 13-29.[3]   Likewise, he was the only supervisor excluded from Diversified's email list for supervisors.   According to Anderson, his "workload was almost triple the workload" that the previous Methode supervisor – a white man – had worked.   Anderson Dep. 37.   When he began acting as the Methode department supervisor, he was earning far less than the previous white supervisor.   Regarding the business skill development training, Anderson presented evidence supporting an inference that Diversified was sending Anderson on a chase to sign up for the training.   He never attended the training, but Jeff Howard, a white maintenance supervisor, attended it.   Anderson was the only black supervisor terminated in the February 2006 "layoff."   In fact, he was the only supervisor terminated in February 2006.   Both sides agree that Anderson was a good worker and that there were no issues with his job performance.

Based on that evidence, a reasonable jury could conclude that Diversified treated Anderson differently because he was black.   This same evidence supports a finding that Anderson has met the elements of a prima facie case of discrimination under the indirect method of proof.   See *Pantoja v. American NTN Bearing Manufacturing Corp.*, 495 F.3d 840, 845 (7th Cir. 2007) (affirming

---

[3]Anderson admits that he was allowed to begin attending these meetings in November and December 2005.   Diversified's corrective action does not relieve it of liability for Anderson's claims, if proved, but may be relevant for assessing any damages.   See *Lust v. Sealy, Inc.*, 383 F.3d 580, 589-91 (7th Cir. 2004) (discussing appropriate damages where jury found that employer discriminated against employee but court found that employer "quickly rectified" discrimination).

summary judgment for employer on discrimination claims; recognizing that under indirect method, plaintiff must show that (1) he is a member of a protected class; (2) he was meeting the employer's legitimate performance expectations; (3) he suffered a material, adverse action; and (4) he was treated less favorably than similarly situated individuals outside the protected class).

To rebut Anderson's prima facie case under the indirect method of proof, Diversified has offered a number of non-discriminatory reasons to explain its actions. Once the employer rebuts a prima facie case of discrimination, the "presumption of discrimination drops out of the picture." *Reeves*, 530 U.S. at 143 (internal quotation marks omitted). The trier of fact may, however, "still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom" in evaluating whether the employer's explanations are pretextual. *Id.* (internal quotation marks omitted).

Diversified has argued that it paid Jeff Howard more than Anderson because Howard was the first Methode department supervisor, which was "a significantly more complicated position than when Rodney Anderson assumed the position." Jessup Aff. ¶ 3. Anderson presented evidence that he too was responsible for at least some of the complex tasks of setting up the Methode department because Howard had left the task of writing the department's policies and procedures to his successor. Anderson Dep. 38. If that evidence is true, a reasonable jury could

find that Diversified's explanation was "unworthy of credence."  *Reeves*, 530 U.S. at 143.

Diversified does not offer an explanation as to why it excluded Anderson from production meetings or the supervisor email list until November 2005. Diversified claims that it did not exclude Anderson from the business skills training because he would not have been eligible to attend until April 2006. Fissell Aff. ¶ 16.  According to Diversified, Fissell led three trainings:  the first from September to December 2004 for "all senior level [Printed Circuit Division] managers"; the second from January to May 2005 for "all [Custom Products Division] managers;" and the third from April to August 2006 for "all supervisors and engineers."  *Id.*  Anderson presented evidence that Jeff Howard, who supervised the company's engineering and maintenance departments at the time, attended the training sometime before Diversified fired Anderson.  Howard Dep. 10, 13; Anderson Dep. 180.  If that evidence is true, a reasonable jury could find that Diversified's explanation – that supervisors were not eligible to attend the training until April 2006 – was pretextual.

Diversified has offered two non-discriminatory reasons for terminating Anderson:  (1) Diversified was shutting down the Methode department in June 2006 and was eliminating Anderson's position; and (2) Diversified had decided to fire several employees, including Anderson, in January 2006.  Viewing the

evidence in the light reasonably most favorable to plaintiff Anderson, a reasonable jury would not be required to accept either of those reasons.

First, the evidence objectively indicates that Diversified was still running the Methode department during discovery in this case – more than a year after Diversified terminated Anderson.   Fox Dep. 172-73; Fissell Dep. 55.   If that evidence is true, a reasonable jury could find that Diversified's explanation – that Diversified intended to shut down the Methode department in June 2006 and eliminate Anderson's position – was pretext.

Second, after Anderson filed an EEOC charge against Diversified for race discrimination, Diversified presented a fairly elaborate explanation that Anderson was part of a larger company-wide layoff scheduled for February 2006.   Fissell, Diversified's then general manager, met with Diversified's owners on January 14, 2006, and determined that Diversified should fire one manager and two supervisors due to financial problems.   Fissell Dep. 24.   On January 16, 2006, Fissell submitted a list proposing that the company terminate manager Bryan Manning and two of the following supervisors:   Jeff Fox, Rodney Anderson, and Eric Steele.   *Id.*   On January 18, 2006, when Diversified fired David DiGregorio in part for his interactions with Anderson about a mis-shipment the day before, Diversified shifted DiGregorio into the management position slated for elimination. *Id.* at 43.

According to Diversified, on January 30, 2006, Fissell gave Fox, the human resources director, a list of the two supervisors the owners had decided to terminate.  *Id.* at 23.  Anderson, however, was the only supervisor Diversified fired from the January 2006 list at that time.  Diversified later demoted Jeff Fox in July 2006 because he married the human resources director (Bernice Fox) and the company wanted to minimize potential conflicts in disciplinary appeals.  *Id.* at 51.  Diversified fired Steele in April 2006 for sexually harassing another employee.  *Id.* at 54.  Diversified destroyed the list that Fissell gave to Bernice Fox on January 30, *id.* at 21, and neither party has submitted a copy of the list that Fissell gave to the owners on January 16.

Diversified claims that it chose to retain Steele because "Eric could do Rodney's job, but Rodney at that time couldn't do Eric Steele's job" because "Rodney had no training in the assembly area."  *Id.* at 25.  Anderson, however, had already learned how to supervise the shipping department.  He had also started participating in a supervisory skills training program at the beginning of December 2005.  Anderson Dep. 128-32; Fissell Dep. 105-07.  If the "weaknesses, implausibilities, inconsistencies, or contradictions" described in the above paragraphs are true, a reasonable jury could find that Diversified's proffered reasons for terminating Anderson – that the company was eliminating his position and that Steele was more qualified to handle a merger of the assembly and Methode departments – were false pretexts and infer that unlawful discrimination was the true reason for Diversified's actions.  See *Boumehdi v. Plastag Holdings,*

*LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (reversing summary judgment for employer on discrimination claim where plaintiff offered evidence of inconsistencies, contradictions, and implausibilities in employer's stated reasons for its actions).

To rebut Anderson's claim that Diversified required him to work more than Howard for less pay, Diversified compiled a summary of hours worked by different supervisors from June 2005 to January 31, 2006.   Fox Dep. Ex. 11 at 2. According to that summary, Anderson worked fewer total hours than all but one other supervisor and had the lowest weekly average of the whole group.   Jeff Howard, however, is not on the list, for either his hours from June 2005 to January 31, 2006, or his hours as the Methode department supervisor.  Thus, the summary, while also not admissible at this stage, does not rebut the evidence that Anderson had more responsibilities than Howard as the Methode supervisor (*i.e.*, working without a group leader and maintaining equipment that other departments had maintained under Howard).   Finally, even if the evidence of pretext as to any one adverse action might be a little thin, the court must remember to consider the evidence as a whole.   *E.g.*, *Reeves*, 530 U.S. at 150, quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The number of inconsistencies and weaknesses in the defendant's explanations, at least when measured for purposes of summary judgment, adds cumulative weight to the possible inference of pretext as to all of the adverse actions.   At this stage, Anderson has submitted evidence sufficient to allow a

reasonable jury to find that Diversified treated him differently because he was black.

II.     *Retaliation Claims*

Anderson also claims that Diversified fired him for complaining about perceived race discrimination and filing an EEOC charge on February 1, 2006, in violation of 42 U.S.C. §§ 1981 and 2000e-3(a).[4]  The analysis above indicates that Anderson has also offered evidence of a prima facie case of retaliatory discharge – under both the direct "convincing mosaic" and indirect routes, substituting opposing perceived race discrimination as the protected activity.  He was also the only supervisor who had filed an EEOC charge or indicated that he would seek legal protection from discrimination before being terminated.  Fissell Dep. 72-77.  The issue then is Diversified's proffered non-discriminatory reason for firing Anderson:  that the company had already decided to fire him by January 30, 2006 – two days before he filed his EEOC charge.

Anderson attempts to rebut this non-retaliatory reason in two different ways.   First, he splices together two fairly shaky observations to create an inference of pretext.  According to Anderson, mail from downtown Indianapolis (where the Indiana Civil Rights Commission office is located) generally takes only

---

[4]The Supreme Court has granted certiorari in *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 397-98 (7th Cir. 2007), which held that section 1981 protects against retaliation.  See *CBOCS West, Inc. v. Humphries*, 128 S. Ct. 30 (2007).  At least for now, the *Humphries* holding on this issue remains binding on this court.

one day to reach Diversified's facility.  Anderson Aff. ¶ 43.  According to Anderson, the mail usually arrived at Diversified around 9 a.m.  *Id.* at ¶ 46.  Thus, he argues, a jury could infer that, by the time that Bernice Fox called to fire him on the afternoon of February 2, 2006, Diversified had already received and read his formal complaint.  Even assuming that Anderson's two observations are true, it is certainly possible – and maybe probable – that the Commission did not post the charge on February 1.[5]  Even if a copy of the charge arrived at Diversified the morning of February 2, it is certainly possible – and maybe probable – that no one at Diversified delivered the charge to Fox until after she had spoken to Anderson that afternoon.  The notice did not have Diversified's date stamp on it indicating when the company received it.  That fact, however, favors neither side.  At best, Anderson has presented two observations that require a chain of unsupported inferences to rebut Diversified's non-retaliatory explanation.  He must look elsewhere to establish pretext.  See generally *Reeves*, 530 U.S. at 148 (recognizing that an employer would be entitled to judgment as a matter of law where "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue").

---

[5]In his affidavit, plaintiff asserted that the Commission mailed his charge to Diversified on February 1, 2006.  To support this assertion, he cites a copy of the notice of the charge sent to Fox (formerly Bernice Holder).  Fox Dep. Ex. 9. The notice indicates that it was generated on February 1, 2006.  It does not, however, indicate that the Commission mailed the notice to Diversified on February 1, 2006.

But the timing of the mail is not the critical issue.  Regardless of whether Anderson can show that Diversified knew about his formal charge, he has shown that Diversified knew he had complained repeatedly about racial discrimination for a number of years.  Anderson also told Fissell and Bernice Fox on January 17, 2006, that "I was going to look into my options of who I could go talk to since nothing had been done" and that "I was going to see who I could talk to legally about me being mistreated."  Anderson Dep. 151.  Two weeks later, Diversified fired him.

Anderson also claims that Diversified fired him for taking FMLA leave, in violation of 29 U.S.C. § 2615(a)(2).  Anderson took time off in the latter half of January 2006 because he felt he was having a "nervous breakdown."  Anderson Dep. 140-41.  On January 30, 2006, on his way to an appointment with his doctor, Anderson stopped by Diversified and picked up FMLA leave certification papers for his doctor to complete.  His doctor put Anderson on leave for the next six weeks due to an "anxiety disorder related to job stress."  Anderson Dep. Ex. 13.  On January 31, 2006, Anderson submitted his doctor's certification to Diversified.  Two days later, Diversified fired him.

While suspicious timing is not necessarily conclusive, suspicious timing plus evidence casting doubt on the legitimacy of the employer's proffered explanation can be sufficient.  See *King v. Preferred Technical Group*, 166 F.3d 887, 894 (7th Cir. 1999) (reversing summary judgment for employer on FMLA

retaliation claim).  Here, in addition to the suspicious timing, as discussed above, there are weaknesses and inconsistencies in Diversified's explanations that it planned to fire Anderson because it was shutting down the Methode department in a matter of months and because another employee was more qualified to absorb Anderson's responsibilities than vice versa.  The evidence shows that Diversified continued to run the Methode department for at least a year after firing Anderson. Anderson also presented evidence that he had been able to learn and manage effectively the supervision of at least one other department.  Fissell also testified that at the time Diversified terminated Anderson, both "Eric Steele and Rodney knew that I was displeased with Eric Steele's performance; and I was happy with Rodney's performance."  Fissell Dep. 25.  Yet, Diversified chose to fire Anderson. A reasonable jury could determine that those weaknesses and inconsistencies combined with the suspicious timing support a finding of pretext.

*Conclusion*

For the foregoing reasons, the court DENIES defendant's motion on Anderson's race discrimination claim and retaliation claims.

So ordered.

Date: April 24, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

-26-

Copies to:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Jane Ann Himsel
LITTLER MENDELSON
jhimsel@littler.com

Todd M. Nierman
LITTLER MENDELSON PC
tnierman@littler.com,jwalterman@littler.com